# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6024 | **DATE** | 6/11/2001 |
| **CASE TITLE** | Gregory Seilheimer vs. Larry G. Massanari, Acting Commissioner of Social Security | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: The Commissioner's motion for summary judgment [20-1] is granted and Seilheimer's motion for summary judgment [14-1] is denied. The Clerk of the Court is directed to enter judgment in favor of the Defendant and against the Plaintiff pursuant to Fed.R.Civ.P. 58.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | 2001 date docketed | |
| | Notified counsel by telephone. | | | 22 |
| | Docketing to mail notices. | FD-7 FILED FOR DOCKETING 01 JUN 11 PM 2:38 | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY SEILHEIMER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 00 C 6024 |
| ) | Magistrate Judge Nan R. Nolan |
| LARRY G. MASSANARI,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory Seilheimer ("Seilheimer") alleges disability due to back pain, right shoulder and knee pain, and left shoulder pain. Seilheimer seeks judicial review of the final decision of the Social Security Commissioner William A. Halter ("Commissioner") finding that he was not entitled to disability insurance benefits and supplemental security income. This matter is before the Court on cross-motions for summary judgment. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Commissioner's motion for summary judgment is GRANTED and Seilheimer's motion for summary judgment is DENIED.

### I. FACTUAL BACKGROUND

**A.  Seilheimer's Testimony**

Seilheimer was born on January 19, 1959. Tr. 349. He completed school through the eleventh grade. Tr. 350. Seilheimer has past relevant work as a truck driver and service station

---

[1] Larry G. Massanari, the acting Commissioner of Social Security, is substituted as defendant for Kenneth S. Apfel, the former Commissioner of Social Security. Fed. R. Civ. P. 25(d)(1).

cashier. Tr. 350-51. Seilheimer has undergone three back surgeries (one in 1989 and two in 1994), five right knee surgeries in the 1980s, a right shoulder surgery in April 1997, and a left shoulder surgery in March 1999. Seilheimer testified that his back hurts him every day. Tr. 354. He experiences pain in his right knee when he is walking but not when he is sitting. Tr. 356. He described his right shoulder as "a lot better than it was" and stated that it only hurt when he held his hand high or did repetitive motions with his right hand. Tr. 356. Seilheimer has taken pain medication in the past but was not taking any at the time of the hearing because he had no insurance and did not want to go to an emergency room for medication. Tr. 355. According to Seilheimer, he can walk a couple of blocks, stand while leaning against something for a half hour to 45 minutes, sit an hour before needing to get up, and lift thirty pounds with his right hand as long as it is not overhead. Tr. 361-62. Seilheimer testified that he can not lift with his left arm. Tr. 362.

Seilheimer stated that he lives with his finance. Tr. 350. Seilheimer further testified that he spends his time working on his computer and talking on a CB radio. Tr. 358, 360. He can cook, do dishes, vacuum, and shop by himself. Tr. 359-60. Seilheimer drives on a daily basis. Tr. 350. He occasionally visits his mother. Tr. 360.

**B.     Medical Evidence**

Seilheimer underwent a hemilaminotomy and diskectomy and lysis of adhesions on two occasions in June of 1994. Tr. 109-121, 121-26. The discharge diagnosis was recurrent herniated nucleus pulposus, left L5-S1 and hypertension. Tr. 109, 122. On September 5, 1995, Seilheimer injured himself at work and complained of lumbar back pain and left hip and groin pain. Tr. 133. On October 18, 1995, Kevin F. Walsh, M.D., indicated that Seilheimer's current neurological and musculoskeletal examinations were objectively unremarkable. Tr. 134. He stated that Seilheimer's

subjective complaints of lumbar pain were without objective physical findings to substantiate his symptoms. Tr. 134. Dr. Walsh opined that Seilheimer's symptoms were merely an exacerbation of a preexisting condition and would be temporary but that his usual occupation of driving a truck would expose him to recurrent symptoms. Tr. 134.

On February 14, 1997, Seilheimer injured his right shoulder while at work. Tr. 171. On March 26, 1997, Seilheimer underwent an arthroscopic bursectomy and open distal clavicular resection of his right shoulder. Tr. 171. Between April 7, 1997 and September 29, 1997, Seilheimer underwent a course of physical therapy. Tr. 136-88.

On April 21, 1998, Seilheimer was treated in the emergency room for back pain. He was diagnosed with lumbar disc disease, and released an hour later with pain medication and instructions to have bed rest and return to his normal schedule in one week. Tr. 189-92. On May 27, 1998, Seilheimer reported to Hermie G. Plunk, M.D., that his feet got numb, his back hurt, and his right arm continued to go "dead" and felt heavy. Tr. 193. Dr. Plunk prescribed Flexaril and Vicodin. Tr. 194. On June 25, 1998, Seilheimer complained of back pain and stated that his left hip and leg hurt and went numb. Tr. 194. Dr. Plunk refilled Seilheimer's pain medication. Tr. 194.

On August 7, 1998, Seilheimer underwent a consultative examination. Tr. 195-202. Seilheimer reported decreased sensation in the first and second toes on his left foot. Tr. 197-99. Seilheimer further reported that his back hurt constantly and was worse when he sat or stood in one position. Tr. 195. The physician noted 30% range of motion in forward flexion, extension, and rotation of Seilheimer's spine, 70% flexion-extension in his lumbar spine, and 10% lateral flexion in his lumbar spine. Tr. 198. Seilheimer had a slight decrease in range of motion in his right shoulder. Tr. 198. The range of motion in his elbows, wrists, hands, hips, ankles, and left shoulder

was normal. Tr. 198-99. The range of motion in his knees was slightly limited. Tr. 199. Seilheimer's reflexes were normal in his arms, knees, and right Achilles. Tr. 199. His reflexes were absent in his left Achilles. Tr. 199. Seilheimer's elbow extension was 3-4 out of 5 and flexion was 4 out of 5. Tr. 199. There was no muscle atrophy. Tr. 199. All gait and coordination findings were normal. Tr. 200. Seilheimer's limb function was normal with the exception of a decreased ability to abduct and flex arm at the right shoulder. Tr. 200. Seilheimer could heel and toe walk and squat but had a moderate amount of difficulty rising from a squat. Tr. 200. All pulses were normal. Tr. 200. The physician diagnosed degenerative disc disease involving the lumbar spine and osteoarthritis of the knees and shoulders. Tr. 201. The physician opined that Seilheimer's ability to sit, stand, walk, and carry objects appeared to be significantly impaired based mostly on his complaints of pain but also by some objective weakness. Tr. 202. The physician further opined that Seilheimer's complaints of pain and his physical findings were compatible with Seilheimer's disease process/diagnosis. Tr. 202.

On August 3, 1998, Seilheimer was seen in the emergency room after a boat motor fell on his right hand. Tr. 206-211. X-rays revealed significant soft tissue swelling over the dorsum of the right hand, no underlying bony abnormalities, and no recent bony injury. Tr. 210. On August 12, 1998, Seilheimer was admitted to the emergency room complaining of back pain and left leg pain. Tr. 203-05. Seilheimer reported twisting his ankle and experiencing a spasm up his leg and in his back. Tr. 205. On August 15, 1998, Seilheimer was again seen in the emergency room after he hit his left hand on a telephone. Tr. 212-215.

On August 24, 1998, Steve Owens, M.D., completed a residual functional capacity assessment. Tr. 216-223. Dr. Owens found that Seilheimer could occasionally lift and/or carry 20

-4-

pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull. Tr. 217. The only postural limitation noted was an occasional ability to stoop and crouch. Tr. 218. Dr. Owens opined that no manipulative, visual, communicative, or environmental limitations existed. Tr. 219-20. Dr. Owens indicated that Seilheimer's symptoms were attributable to a medically determinable impairment. Tr. 221.

In September 1998, Seilheimer went to the emergency room on five occasions (September 2, 12, 15, 16, 18). Tr. 224-38, 241-45. Seilheimer complained of back pain that radiated to his left leg. Tr. 226, 230. Examinations revealed normal upper and lower extremity strength, no swelling or tenderness in his arms and legs, and mild to moderate tenderness in his back. Tr. 226-27, 230, 233-34, 243-44.

On September 16, 1998, Hermie G. Plunk, M.D., was asked to describe Seilheimer's ability to perform work activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling. Tr. 239. Dr. Plunk was further asked to cite specific clinical and/or laboratory findings for any limitations. Tr. 239. Rather than responding to the specific request, Dr. Plunk simply listed numerous diagnoses applicable to Seilheimer. Dr. Plunk failed to provide any clinical findings supporting his diagnoses. Tr. 239. On September 22, 1998, Dr. Plunk wrote on a prescription form: "This patient is not able to work due to back pain. He is being treated for this – surgery pending." Tr. 240. Between September 22, 1998 and December 1998, Seilheimer was seen by Dr. Plunk on several occasions for back pain and received pain medication. Tr. 343-44.

From October 1998 through May 1999, Seilheimer was seen in the emergency room twenty-four times complaining generally of left leg pain, right knee pain, back pain, and left shoulder pain.

Tr. 246-342. On November 6, 1998, after Seilheimer slipped in a hole while chasing his dog, an x-ray of his right knee revealed:

> [N]o evidence of an acute fracture or dislocation. There is some unusual calcific density seen posterior and slightly to the right of the distal diaphysis of the right femur. This was present on the 09/26/93 examination and is likely benign. This could be posttraumatic or postinflammatory.

Tr. 255. On November 10, 1998, Seilheimer underwent a CT scan of his lumbar spine which showed broad-based disc bulge at L4-L5 and probable post-surgical changes at L5-S1 on the left. Tr. 258-59. An MRI of the lumbar spine taken the next day found epidural fibrosis that was extensive around the left S1 nerve root, a tiny disc fragment appeared present on the left at this level which was not having much mass effect on the nerve root, and chronic small central hard disc herniation at L4-L5 with associated narrowing of both lateral recesses. Tr. 261-62.

On February 24, 1999, Seilheimer was seen in the emergency room for left shoulder pain but an arthrogram was normal. Tr. 295-97. Seilheimer returned to the emergency room three days later and was diagnosed with tenosynovitis of the left shoulder. Tr. 298-301. On March 16, 1999, Seilheimer underwent surgery on his left arm. Tr. 303. Glenn E. Dickson, M.D., noted: no apparent subluxation which the patient had been describing; minimal chondromalacia of the humeral head that appeared to be chronic; and tiny separated area in the anterior labrum appeared perfectly normal after a single absorbable pack was inserted into the area to stabilize it. Tr. 303. A MRI of Seilheimer's left shoulder on March 27, 1999 revealed tendinitis in the supraspinatus tendon as well as subacromial bursitis and some osteophyte formation in the AC joint. Tr. 307. On April 10, 1999, Seilheimer was seen in the emergency room complaining of left arm pain. Tr. 308-311. The examination revealed good pulse in the injured extremity, no erythema, no swelling, mild tenderness

and no abrasions or lacerations. Tr. 311. Seilheimer had intact motor and sensory findings in his left arm. Tr. 311.

On May 5, 1999, Seilheimer was seen in the emergency room after twisting his right knee. Tr. 317-22. An x-ray of the knee showed mild degenerative changes and no signs of acute bony abnormality. Tr. 321. The physician found the x-rays unremarkable and diagnosed a knee contusion and sprain. Tr. 320. Seilheimer was directed to use a knee brace for 2-3 days and if needed longer, to follow-up with an orthopedic physician. Tr. 322.

On May 18, 1999, Seilheimer was seen in the emergency room complaining of left shoulder pain. Tr. 323-26. The physician noted mild swelling/tenderness in the left shoulder, limited range of motion due to pain, and no edema. Tr. 326. The diagnosis was impingement syndrome or subluxation. Tr. 326. Seilheimer was advised to use a sling for comfort and to follow-up with Dr. Dickson as soon as possible to evaluate the status of his post-operative shoulder. Tr. 329. A May 26, 1999 MRI of the cervical spine showed mild annular disc bulge from C4-C5 through C6-C7 without evidence of spinal stenosis or neuroforminal compromise. Tr. 331.

On September 18, 1999, Seilheimer slipped on a PVC pipe at his home and landed on his buttock and back. Tr. 335. Seilheimer was brought to the emergency room. Tr. 332-42. X-rays revealed no evidence of fracture, but there was definite narrowing of the lumbosacral disc. Tr. 335. Seilheimer was treated with medication and advised to ambulate with a walker for the next few days, to stay active, and to follow-up with his family physician. Tr. 335. The emergency room physician's final diagnosis was: acute lumbar muscle spasm secondary to fall, lumbosacral strain, and chronic lumbosacral disc disease. Tr. 336.

## C. Vocational Expert's Testimony

At the hearing, the vocational expert ("VE") testified that Seilheimer's past relevant work as a truck driver was semi-skilled, medium work and his work as a service station cashier was semi-skilled, light work. Tr. 375. The ALJ asked the VE whether a hypothetical person with Seilheimer's age, education, and work history and the residual functional capacity to frequently lift up to 10 pounds and occasionally lift up to 20 pounds using only the right dominant hand for lifting; sit up to one hour at a time with an opportunity for a short break or change in position but otherwise unlimited up to 8 hours; stand up to 30 minutes at a time, 4 hours maximum; walk up to 10 minutes at a time, 1 hour maximum; and no crawling, climbing, crouching, repetitive stooping, kneeling, or reaching above the shoulders could perform any jobs in the national economy. Tr. 375-76. The VE testified that the limitations precluded Seilheimer from performing his past relevant work but he could perform 22,000 light jobs and 3,500 sedentary jobs in the regional economy. Tr. 376.

## D. The ALJ's Decision

The ALJ found that the medical evidence established that Seilheimer had the following severe impairments: chronic back pain due to degenerative disc disease, recurrent right shoulder pain due to post surgical residuals, recurrent right knee pain due to post surgical residuals, and since February 1999, recurrent left shoulder pain due probably to tendinitis. Tr. 22. The ALJ further found Seilheimer's subjective allegations of a disability incredible. Tr. 22. The ALJ concluded that Seilheimer's impairments precluded him from lifting more than ten pounds frequently or twenty pounds occasionally; sitting for longer than one hour at a time without the opportunity for a short break or change in position (but otherwise unlimited up to eight hours a day); standing for longer than thirty minutes at a time or four hours total in a work day; walking for longer than ten minutes

at a time or one hour total in a work day; crawling, climbing ladders or scaffolds; or repetitively kneeling, stooping, crouching, or reaching above shoulder level. Tr. 22. The ALJ found Seilheimer unable to perform his past relevant work. Tr. 22. Given Seilheimer's young age, limited education, nontransferable job skills, and remaining functional capacity, the ALJ concluded that Seilheimer could perform a significant number of jobs in the regional and national economies. Tr. 23. The ALJ determined that Seilheimer was not disabled. Tr. 23.

## II. **DISCUSSION**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order:

1. Is the claimant presently unemployed?

2. Is the claimant's impairment severe?

3. Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. § 416.920(a)-(f). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. Young v. Secretary of Health and Human Services, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. Id. The claimant bears the burden of proof at steps 1-4. Id. Once the claimant shows an inability to perform

past work, the burden shifts to the Commissioner to show ability to engage in other work existing in significant numbers in the national economy. Id.

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

Seilheimer raises the following three arguments in support of his motion for summary judgment: (1) the ALJ failed to adequately develop the record; (2) the ALJ erred in posing an inadequate hypothetical question; and (3) the ALJ erred in failing to credit Seilheimer's treating physician's opinion of disability. The Court will address each argument in turn.

## A. Development of the Record

Seilheimer, who was represented by counsel, did not request a consultative mental examination, but he now argues that the ALJ erred in failing to order a consultative mental examination to determine if he has a severe mental impairment which in combination with his physical impairments renders him disabled. Seilheimer argues that it is possible that he suffers from depression secondary to his chronic pain.

The ALJ in a social security hearing has a duty to fully and fairly develop the record. Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997). This obligation is heightened when the claimant is unrepresented by counsel. Id. Because Seilheimer was represented by counsel at the hearing before

the ALJ, the heightened obligation does not apply here. The Secretary has a duty to develop the claimant's complete medical history, which means claimant's medical records covering at least the 12 months preceding the month in which the claimant's application was filed. Luna v. Shalala, 22 F.3d 687, 693 (7th Cir. 1994). The Secretary will try to obtain additional evidence "if the evidence before her is insufficient to determine whether a claimant is disabled or, if after weighing the conflicting evidence, she cannot reach a conclusion." Id. Courts generally respect the Secretary's reasoned judgment on how much evidence to gather in a particular case. Id. at 692.

The ALJ did not err in failing to order a mental consultative examination. Although the ALJ has an obligation to develop a full and fair record, Seilheimer maintained the responsibility of providing medical evidence of a mental impairment. Howell v. Sullivan, 950 F.2d 343, 348 (7th Cir. 1991). Seilheimer fails to point to any objective evidence from a medical source which supports his depression claim. Seilheimer points out that: (1) he was observed as "tearful" in the emergency room on one occasion when he complained of back pain; (2) he stated during one of his emergency room visits that he felt like ending his life if he was unable to get pain relief; and (3) he testified at the hearing before the ALJ that he cries "quite a bit," has difficulty sleeping, and his nerves are "kind of shot" because he feels he cannot get adequate medical treatment for his physical limitations and he is worried about his financial future. Tr. 243, 287, 361, 366, 367. These isolated statements in a record consisting of more than five years of medical documentation do not suggest that Seilheimer's mental state prevents him from performing substantial gainful activity. With one exception in 1994, no evidence in the record indicates that Seilheimer was ever seen by a physician

or therapist for mental problems.[2] Without objective medical evidence of depression, the ALJ was not obligated to order a consultative exam. Howell, 950 F.2d at 349 (holding ALJ did not err in not ordering a consultative examination where there was no objective evidence to support the claimant's alcoholism claim).

In addition to the lack of objective evidence of a severe mental impairment, the ALJ properly considered Seilheimer's moderately active daily routine. Tr. 15. Seilheimer lives with his fiancee and spends a typical day working on his computer, talking on a CB radio, and performing certain household chores. Tr. 15. Seilheimer takes cares of his personal needs, drives on a daily basis, and shops twice a week. Tr. 15. Given the absence of objective medical evidence of a mental impairment and Seilheimer's relatively normal activities, the ALJ could reasonably have concluded from the record that Seilheimer's mental state did not affect his ability to work. Griffith v. Callahan, 138 F.2d 1150, 1153 (7th Cir. 1998) (holding the ALJ did not err in failing to purchase consultative mental health examination where evidence suggested that claimant's mental impairment was mild and the ALJ could rationally conclude that the medical evidence provided sufficient information to assess the impact of claimant's impairment on her ability to work).

---

[2] After his two back surgeries in June 1994, Seilheimer was admitted to the hospital for pain control. Tr. 122. At that time, Seilheimer expressed suicidal ideation and consulted with Dr. Blalock. Dr. Blalock felt Seilheimer was not suicidal and no preventive measures were needed. Tr. 123. Dr. Blalock diagnosed Seilheimer with situational (adjustment) disorder with depression features. Tr. 123. A single episode of situational disorder is not severe enough to constitute a disability. A disability finding must be based on an impairment which "has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1); Bunch v. Heekler, 778 F.2d 396, 400 (7th Cir. 1985) (holding acute episode of schizophrenia lasting 2 months did not demonstrate that mental illness prevented substantial gainful activity for continuous twelve-month period).

## B. Hypothetical Question

Seilheimer argues that the ALJ erred in posing an inadequate hypothetical question. "The hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." Herron v. Shalala, 19 F.3d 329, 337 (7th Cir. 1994). Here, the ALJ asked the VE a hypothetical question that included a residual functional capacity assessment restricting Seilheimer to a limited range of light work. Tr. 375-76. The VE responded that Seilheimer could perform 22,000 jobs at the light exertional level and 3,500 jobs at the sedentary exertional level. Tr. 376. Seilheimer argues that the hypothetical question posed to the vocational expert was insufficient because he can perform only sedentary work, not light work. Seilheimer relies on a September 9, 1997 functional capacity evaluation performed by Mark Neu, a licensed physical therapist, in which Neu opined that Seilheimer is able to perform sedentary work. Tr. 141.

Seilheimer's challenge to the hypothetical question because it failed to limit Seilheimer's capacity to sedentary work is unpersuasive. The Secretary does not recognize Neu, a physical therapist, as an acceptable medical source. 20 C.F.R. §§ 404.1513(a), 416.913(a). Physical therapists qualify as "other sources" whose opinions are entitled to significantly less weight than that accorded to the opinions of acceptable medical sources. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, Neu admitted that the results of the functional capacity evaluation were equivocal because Seilheimer demonstrated an equivocal validity profile. Tr. 141. In addition, Seilheimer's own testimony contradicts his argument that no evidence in the record suggests that his capacity increased since the time of Neu's opinion. Neu evaluated Seilheimer on September 9, 1997, less than six months after he underwent surgery on his right shoulder. Tr. 142. Neu's opinion that

Seilheimer was limited to sedentary work was based in part on Seilheimer's then right shoulder lift capacity of 0 lbs. Tr. 141. At the hearing before the ALJ in December of 1999, Seilheimer admitted that his right shoulder was " a lot better" and he could now lift 30 pounds with it. Tr. 356, 362.

In any event, it does not matter that the ALJ allowed for the possibility that Seilheimer could perform work at either the light or sedentary exertional level in the hypothetical. Even if the ALJ accepted Neu's opinion, Seilheimer would not be found disabled. Neu found Seilheimer capable of performing sedentary work. The VE opined that 3,500 jobs sedentary jobs existed which Seilheimer could perform. Tr. 376. The Seventh Circuit has found that 3,500 positions is a significant number of jobs . Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (1,400 jobs is a significant number). Accordingly, the ALJ did not err in failing to limit Seilheimer's residual functional capacity to sedentary work in the hypothetical posed to the VE.

### C. Treating Physician's Opinion

Seilheimer next argues that the ALJ erred in failing to credit Dr. Plunk's opinion that Seilheimer was unable to work due to back pain. Tr. 20. On September 22, 1998, Dr. Plunk wrote on a prescription form: "This patient is not able to work due to back pain. He is being treated for this – surgery pending." Tr. 240. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight only if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2). A claimant is not entitled to disability benefits "simply because a physician finds that the claimant is 'disabled' or 'unable to work'." Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). The Commissioner is charged with making the disability determination. Id.

The ALJ properly rejected Dr. Plunk's opinion because it was not supported by objective findings and was inconsistent with the record as a whole. Tr. 20. Dr. Plunk's submission to the ALJ consisted of the following: four pages of handwritten notes taken during Seilheimer's visits to him, a one page list of diagnoses, and the prescription form described above. Tr. 239, 240, 343-44. The office visit notes indicate that Seilheimer visited Dr. Plunk on four occasions (May 27, 1998, June 25, 1998, September 22, 1998 and October 13, 1998). Tr. 193-94, 343-44. Seilheimer complained of back pain and leg pain on those occasions. The remainder of Dr. Plunk's notes show that Seilheimer called his office on three occasions complaining of pain and requesting prescriptions for pain medication. Tr. 343. None of Dr. Plunk's submissions report any clinical or laboratory findings supporting his opinion of disability or diagnoses. For this reason, substantial evidence supports the ALJ's finding that Dr. Plunk failed to support his opinion with objective findings.

Moreover, Dr. Plunk's opinion of disability due to back pain was inconsistent with the record as whole. Although the ALJ found that Seilheimer had chronic back pain due to degenerative disc disease, substantial evidence in the record supports the ALJ's finding that Seilheimer retains the residual functional capacity to perform substantial gainful activity. For example, on August 24, 1998, Dr. Owens opined that Seilheimer can occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour day, sit about 6 hours in an 8-hour day, and push and/or pull. Tr. 217. Dr. Owens found Seilheimer able to occasionally stoop and crouch. Tr. 218. On August 25, 1998, a vocational analyst who reported reviewing all the available evidence agreed with Dr. Owens' assessment of Seilheimer's ability to lift, stand and/or walk, sit, and stoop and crouch. The vocational expert opined that Seilheimer can perform a wide range of light work. Tr. 105. In September of 1998 when Seilheimer was seen in the emergency room complaining of back pain, the

examining physicians noted no significant abnormalities, normal arm and leg strength, nor swelling or tenderness in his arms and legs, and only mild to moderate back tenderness. Tr. 226-27, 230, 233-34. As recently as late September 1999 when Seilheimer fell and re-injured his back, the physician reported moderate lumbosacral perivertebral muscle tenderness and narrowing of the lumbosacral disc but found no evidence of deformity, no pelvic pain, and full sensation in both legs. Tr. 335. Seilheimer's moderately active daily routine is also inconsistent with Dr. Plunk's opinion of disability due to back pain. Given the other evidence in the record, the ALJ reasonably rejected Dr. Plunk's unsupported opinion.

### III. CONCLUSION

For the reasons explained above, the Commissioner's motion for summary judgment is GRANTED and Seilheimer's motion for summary judgment is DENIED. The Clerk of the Court is directed to enter judgment in favor of the Defendant and against the Plaintiff pursuant to Fed.R.Civ.P. 58.

ENTER:

*Nan R Nolan*

**Nan R. Nolan**
**United States Magistrate Judge**

Dated: June 11, 2001